Farid v. Ellen

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued:    June 8, 2009                              Decided:    January 28, 2010 )

Docket No. 07-4057-pr(L), 07-4070-pr(XAP)

_____

MUJAHID FARID,

*Plaintiff-Appellant-Cross-Appellee*,

– v. –

DR. I. ELLEN, CLINTON CORRECTIONAL FACILITY, COMMISSIONER GLENN S. GOORD, OF THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, LIEUTENANT L. JONES, AT THE WOODBOURNE CORRECTIONAL FACILITY, SUPERINTENDENT JOHN P. KEANE, OF THE WOODBOURNE CORRECTIONAL FACILITY, THOMAS MILLER, DEPUTY SUPERINTENDENT AT WOODBOURNE CORRECTIONAL FACILITY, JOHN MITCHELL, NURSE ADMINISTRATOR AT THE CLINTON CORRECTIONAL FACILITY, DIRECTOR DONALD SELSKY, OF SPECIAL HOUSING UNITS, SUPERINTENDENT DANIEL SENKOWSKI, OF CLINTON CORRECTIONAL FACILITY, DR. LESTER WRIGHT, DEPUTY COMMISSIONER OF NYS DEPARTMENT OF CORRECTIONAL SERVICES; INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES,

*Defendants-Appellees-Cross-Appellants.*[*]

_____

Before: CALABRESI, SACK, and WESLEY, *Circuit Judges*.

_____

Appeal and cross-appeal from a final judgment of the United States District Court for the Southern District of New York (Castel, *J.*). We affirm the District Court's determination that

_____

[*] The Clerk of Court is directed to amend the official caption to conform to the listing of the parties stated above.

prison prohibitions on "smuggling" and "contraband" were unconstitutionally vague as applied to Farid, who was disciplined under prison rules for possessing and distributing a pamphlet produced in violation of the internal by-laws of a prisoners' organization. We, however, vacate the District Court's grant of summary judgment with regard to Defendants' qualified immunity in the application of those rules. We affirm in all other respects. AFFIRM in part, VACATE in part, and REMAND for consideration of Farid's qualified immunity claims. On remand, we also ask the District Court to determine whether Farid adequately pled a separate retaliation claim.

_____

MEGHANN E. DONAHUE (Philip A. Irwin, *on the brief*), Covington & Burling LLP, New York, N.Y., *for Plaintiff-Appellant-Cross-Appellee*.

SASHA SAMBERG-CHAMPION, Assistant Attorney General (Andrew M. Cuomo, Attorney General, Barbara D. Underwood, Solicitor General; and Michelle Aronowitz, Deputy Solicitor General, *on the brief*) New York, N.Y., *for Defendants-Appellees-Cross-Appellants.*

_____

CALABRESI, *Circuit Judge*:

Plaintiff-Appellant-Cross-Appellee Mujahid Farid filed a Section 1983 claim against Defendants—all of whom are state prison officials at either Woodbourne Correctional Facility ("WCF") or Clinton Correctional Facility—asserting six claims for relief: first, due process and state law violations based on the filing and conduct of a disciplinary hearing; second, First Amendment violations based on disciplinary actions resulting from his possession and distribution of a booklet called "The Politics of Parole"; third, constitutional and state law violations based on the seizure of documents related to "The Politics of Parole"; fourth, constitutional violations arising out of his transfer to another facility while he was undergoing medical treatment; fifth, constitutional and state law violations arising out of the alleged deprivation of follow-up medical treatment; and sixth, constitutional violations arising from a

2

prison transfer that disrupted a scheduled trial. All but the first and sixth claims are before us here.

The present appeal involves three separate opinions by the District Court. *First*, the United States District Court for the Southern District of New York (Castel, *J.*) dismissed without prejudice Farid's third and sixth claims due to his failure to exhaust available administrative remedies, as required by the Prison Litigation Reform Act of 1995 (the "PLRA"), 42 U.S.C. § 1997e(a). *Farid v. Ellen*, No. 01 Civ. 8292, 2003 WL 23018805 (S.D.N.Y. Dec. 23, 2003) ("*Farid I*"). *Then*, after denying Farid's motion to supplement his complaint with new defendants and allegations, the Court granted Defendants' motion for summary judgment on the first, fourth and fifth claims, holding that Farid had failed to come forward with evidence upon which a reasonable jury could find in his favor on those claims. *Farid v. Ellen*, No. 01 Civ. 8292, 2006 WL 59517 (S.D.N.Y. Jan. 11, 2006) ("*Farid II*"). *Finally*, in a published decision, the District Court addressed Farid's second claim (his First Amendment allegations), and held that the prison's catch-all contraband and anti-smuggling rules were unconstitutionally vague as applied to Farid. The court entered a permanent injunction ordering defendant Goord (a) to reinstate Farid's lost good-time credits and (b) to strike the violation from his disciplinary record. But, on the grounds of qualified immunity, the court also granted Defendants summary judgment with respect to the award of any monetary relief on this claim. *Farid v. Ellen*, 514 F. Supp. 2d 482 (S.D.N.Y. 2007) ("*Farid III*").

The parties have appealed and cross-appealed these decisions. We affirm them in all respects save one: Because we find that Defendants' conduct violated clearly established rights,

the existence of which a reasonable prison official should have known, we vacate the finding of qualified immunity and remand for further proceedings consistent with this opinion.

**I. Background**

*A. Facts*

Farid is serving an indeterminate sentence with a maximum of life imprisonment. *See Farid v. Travis*, 17 A.D.3d 754 (3d Dep't 2005). From December 1997 to June 2000, he was incarcerated at WCF, a state prison in Woodbourne, New York. During this time, he was a member of an inmate organization known as the Long Termers Committee ("LTC"). The New York Department of Corrections ("DOCS") recognized and approved the existence of the LTC, whose stated purpose, inter alia, was "to advocate for positive and constructive change in the criminal justice system, particularly as it relates to the unique concerns of long term prisoners." Members of the LTC, including Farid, agreed to be governed by the Committee's by-laws, one of which provides that all "correspondence, callouts and fiscal expenditures must be reviewed and approved by the staff advisor [to the LTC]." Section 11 of the by-laws lists the consequences of violation, including censure or reprimand for one violation; suspension from LTC for multiple violations; and expulsion from LTC for "repeated and serious violations." None of the listed consequences entail, or even suggest, discipline under *prison* rules.

Of course, prison officials regulate group and organizational activities within the prison, but they do so pursuant to DOCS rules, not under those of internal prisoner groups. Thus, for example, inmates are not permitted to engage in unauthorized organizational activities or meetings, or to possess or distribute unauthorized materials. *See, e.g.*, DOCS Institutional Rule of Conduct 105.12, 7 N.Y.C.R.R. § 270.2(B)(6)(v) ("An unauthorized organization is any gang

4

or any organization which has not been approved by the deputy commissioner for program services.").

DOCS rules also prohibit "contraband" and "smuggling." The catch-all contraband provision, Rule 113.23, 7 N.Y.C.R.R. § 270.2(B)(14)(xiii) reads as follows:

> In addition to those items of contraband specifically identified by this rule series, an inmate shall not possess any item unless it has been specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility.

And, the anti-smuggling rule, Rule 114.10, 7 N.Y.C.R.R. § 270(B)(15)(i), provides that "[a]n inmate shall not smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another." Transfer of items which are contraband under Rule 113.23 constitutes smuggling under Rule 114.10. It is these two rules under which Farid was eventually disciplined.

On April 6, 2000, officers conducted random searches of cells at WCF. No contraband was found in Farid's cell during this search. However, in another inmate's cell, officials discovered a copy of a booklet called "The Politics of Parole: An Analysis by The Woodbourne Long Termers Committee," which among other things criticized parole policies and practices. The twenty-one page booklet also contained profiles of nine prisoners, including Farid. The District Court noted that the booklet "has the appearance of a professionally formatted document." The booklet argued, inter alia, that the "Parole board is prone to corruption [and] political influence," that "[t]he weight of the injustice of the criminal justice system falls disproportionately on communities of color," and that "[i]t will require the unified effort of every element of the community, including prisoners, to bring about the needed change." The booklet

5

is dated April 2000 and—critically for the proceedings here—listed the WCF address of the LTC on its cover page, thus arguably giving the impression that it was prepared by the LTC.

On or about April 7, 2000, while Farid was at his work assignment, corrections officers searched his cell and confiscated various written materials. Among the papers seized were "2 envelopes of papers and approximately 150 pages of parole related articles." Also confiscated were seven copies of "The Politics of Parole." Other materials taken included "[m]ultiple letters to civilians explaining the book and its distribution, envelopes to civilians that coincide with letters and [a] list of addresses that correspond to envelopes and letters."

At a later deposition, Farid acknowledged that he was the principal author of "The Politics of Parole" and that he created it "working with" the LTC. He accepted the characterization of the work as having been prepared by the LTC. Farid also acknowledged that the work was not "authorized" by DOCS.

On April 8, 2000, Farid received an Inmate Misbehavior Report ("IMR") alleging that he had committed several disciplinary violations by possessing and distributing, without authorization, copies of the booklet, letters and envelopes. Specifically, Farid was charged with: (1) violating the catch-all contraband provision, Rule 113.23, through his possession of "The Politics of Parole" and associated items; (2) smuggling or attempting to smuggle in violation of Rule 114.10; (3) possessing unauthorized organizational materials in violation of Rule 105.12; (4) giving unauthorized legal assistance in violation of Rule 103.20; (5) soliciting foods or services in violation of Rule 103.20; and (6) violating Rule 180.11, which provides that "[a]n inmate shall comply with and follow the guidelines and instructions given by staff regarding facility correspondence procedures." *See Farid III*, 514 F. Supp. 2d at 487.

6

Deputy Superintendent of Administration Thomas Miller, a defendant in this action, presided at an April 12, 2000 "Tier III" disciplinary hearing regarding the charges set forth in the April 8, 2000 IMR. *See Porter v. Coughlin*, 421 F.3d 141, 142 n.1 (2d Cir. 2005) ("The most serious violations are the subject of Tier III hearings and may result in [Special Housing Unit] confinement for the remainder of the inmate's prison time, as well as forfeiture of 'good time' credits."). Farid was provided with an opportunity to select an individual to assist him in the hearing, and chose Corrections Counselor Charles Davis, a non-defendant. At the hearing, Farid raised a variety of defenses, including allegations that Defendant (and Superintendent of the Facility) John P. Keane had targeted him because he—along with other members of the LTC— had invited state legislators to visit the prison the previous August as part of a conference on parole and prison issues. Farid also argued that the IMR should be dismissed for lack of "clear notice of any particular conduct . . . [he] supposed[ly] violated."

Lieutenant Lawrence Jones, also a defendant in this action, testified that another officer had found "The Politics of Parole" in an inmate's cell during an April 6 search. Jones had checked with the staff advisor to the LTC and the deputy superintendent and determined that the pamphlet had not been properly authorized, and so he "instituted an investigation to determine who was making the pamphlet." Jones and Keane testified that they would have had no objection to Farid's possession of the pamphlet if he had written and possessed it himself, but that it was contraband *because it purported to be an official LTC publication*, which it was not, as it had not been approved. Moreover, Jones said that Farid had violated the contraband ban by possessing other inmates' parole materials, since an inmate should not possess "another inmate's papers showing their crime and . . . other facts about their criminal history."

7

At the conclusion of the hearing on April 13, Miller found Farid guilty of the possession of contraband, soliciting goods or services and smuggling.  Miller found Farid not guilty of all other offenses.  Miller imposed sanctions against Farid of confinement for ninety days in the Special Housing Unit ("SHU"),[1] a loss of ninety days of various privileges—packages, commissary, special events and phones—and a loss of three months of "good time" credits.  Farid's disciplinary history indicates that he served the SHU portion of the punishment between April 7, 2000 and July 6, 2000.

In June of 2000, Farid appealed the disciplinary findings to defendant Glenn Goord, the DOCS Commissioner.  Acting on behalf of defendant Goord, defendant Donald Selsky, the DOCS Director of SHUs, dismissed the charge of soliciting goods or services but allowed the other disciplinary findings and the punishments to stand.  Hence, the disciplinary charges that were sustained and form the basis for the discipline imposed were violations of the rules governing "contraband" and "smuggling."  These are the rules whose constitutionality we must consider in the present appeal.

*B. Proceedings Below*

Farid filed his 1983 claim in September 2001.  As noted above, the District Court resolved the issues that are on appeal here in three separate opinions and an order.

---

[1] SHU confinement generally involves being placed in solitary confinement for twenty-three hours per day, limited to two showers per week, and denied various privileges granted the general prison population.  *See Palmer v. Richards*, 364 F.3d 60, 65 n.3 (2d Cir. 2004).

In *Farid I*, 2003 WL 23018805, issued on December 23, 2003, the Court dismissed without prejudice Farid's third and sixth claims on the basis that he had failed to exhaust available administrative remedies as required by the PLRA.[2]

In *Farid II*, 2006 WL 59517, issued on January 11, 2006, after the close of discovery, the District Court granted Defendants' motion for summary judgment on the first, fourth and fifth claims, finding that Farid had failed to show evidence upon which a reasonable jury could find in his favor. The court, however, denied, without prejudice, summary judgment as to Farid's First Amendment claim, and invited the parties to pursue the issue through more fully developed briefing. The Court remarked that "[t]he briefs submitted by the parties have left many questions unanswered" as to the First Amendment claim, and then urged the plaintiff to "explain precisely what speech or conduct he argues was constitutionally protected and precisely what adverse action he suffered." *Id.* at *8.

Instead of doing that, Farid tried to take an interlocutory appeal to our Court. On November 11, 2006, we dismissed that appeal, and Defendants again moved for summary judgment on the First Amendment claim. In an Order filed on July 26, 2007, the District Court made its suggestion more explicit, this time specifically asking the parties to submit further argument on whether the rules were vague as applied. They complied.

---

[2] On September 22, 2004—three years after filing his initial complaint and well after Defendants' motion to dismiss had been granted in *Farid I*—Farid sought to amend his complaint to add new allegations and new defendants. The District Court denied leave to amend without prejudice to Farid filing separately in the Northern District of New York, where the additional defendants were located, which Farid later did successfully. He nonetheless argues in his appeal from *Farid I* that the District Court erred by denying him leave to amend. We review such determinations for abuse of discretion, *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990), find none here and affirm the District Court's decision.

9

Finally, in a published opinion issued on August 15, 2007, *Farid III*, 514 F. Supp. 2d 482, the District Court held that the "contraband" and "smuggling" prison regulations under which Farid had been disciplined were unconstitutionally vague, but that Defendants were nevertheless entitled to qualified immunity. First, the court concluded that

> on this record . . . Rules 113.23 and 114.10, as they were applied to Farid, did not contain explicit standards and gave prison officers unfettered discretion in interpreting what conduct is prohibited. That unfettered discretion impermissibly permitted the viewpoint expressed by the inmate to enter into an evaluation of whether the conduct was violative of the rules.

*Id.* at 492. Despite finding a First Amendment violation, the court held that Defendants were entitled to qualified immunity:

> All defendants are entitled to summary judgment on the defense of qualified immunity because the right was not clearly established. Alternatively, and assuming, arguendo, that the right was clearly established, summary judgment in favor of defendants would be proper because reasonable prison officials could have disagreed as to whether the right would be violated by their actions.

*Id.* at 495. The District Court therefore declined to grant money damages to Farid, but did order Defendants to remove the punishment from his disciplinary record, and to restore to him the three months of good time credits he had lost. *Id.* at 496.

Farid appealed the District Court's grants of summary judgment and qualified immunity, and we appointed counsel. Defendants cross-appealed the District Court's finding of a First Amendment violation. We consider each of these issues in turn.[3]

**II. Farid's Vagueness Challenge**

---

[3] Farid's appeal of the District Court's denial of his motions to supplement his complaint is dealt with at footnote 2, *supra*.

The first question we consider is whether, in the special constitutional context of prison regulations, the rules under which Farid was disciplined were unconstitutionally vague as applied to him. We agree with the District Court that they were.

It is well established that "while inmates do not shed all constitutional rights at the prison gates, . . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999) (internal quotation marks omitted). In light of this background principle, we have approved a two-prong test for determining whether a prison rule is unconstitutionally vague as applied: "[A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Id.*

In *Chatin*, which the parties agree is the most relevant precedent, we considered whether a DOCS disciplinary rule barring "[r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent" was unconstitutionally vague as applied to silent, individual prayer. *Id.* at 84 (quoting Rule 105.11). We found that it was, rejecting DOCS's argument that the rule's vagueness was cured by an internal DOCS Directive and memorandum from prison staff, which together clarified that silent prayer was covered by the rule. *Id.* at 87-89, 91. We held that prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct. *Id.* at 88-89.

11

Here, Farid was charged with violating the prison's bans on contraband (Rule 113.23) and smuggling (Rule 114.10).[4]  As noted above, the catch-all *contraband* provision states:

> In addition to those items of contraband specifically identified by this rule series, an inmate shall not possess any item unless it has been specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility.

This Rule, "by its express terms[,] is addressed to 'possess[ion]' of an 'item.' It is not directed to organizational activity, distribution of materials within the prison facility or the manner in which the mails are used." *Farid III*, 514 F. Supp. 2d at 490.

The *anti-smuggling* rule provides that

> an inmate shall not smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another.

In Farid's case, the application of the smuggling prohibition was based entirely on his alleged violation of the contraband rule—the fact that the booklet was found to be contraband meant that distributing it was smuggling.

We agree with the District Court that these rules were unconstitutionally vague as applied to Farid, both because they failed to give him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them.

Because the "smuggling" charge under Rule 114.10 was based entirely on the status of the materials as contraband, we begin with Rule 113.23, the catch-all contraband rule.  (If the

_____

[4] As the District Court noted, Farid was *not* disciplined under other regulations which would, at first blush, appear to be more relevant: Rules 110.21 (possession of unauthorized papers); 180.11 (noncompliance with guidelines regarding correspondence); 180.17 (providing unauthorized legal assistance); and 105.12 (unauthorized organizational activities).  Charges were brought under these rules as well, but were dismissed by Deputy Superintendent Thomas Miller, who oversaw the Tier III disciplinary hearing.

contraband charge is constitutionally infirm, it follows that the smuggling charge also must fail.)

The basic shortcoming with the contraband rule, as applied here, is precisely the one identified by the District Court: There is nothing in the rule indicating that materials which violate a prison organization's *internal* by-laws are contraband in violation of the *prison's* rules. The internal by-laws of the LTC require each member to receive and become familiar with their contents. They expressly provide that "[a]ll correspondence . . . must be reviewed and approved by the staff advisor." All communications with the staff advisor are to be made through the Chairman of the LTC. Section 11.02 of the by-laws states that "[a] member determined to have violated a provision of the Constitution, By-laws or facility or departmental policies and procedures may, after being afforded an opportunity to be heard and to present his views, be sanctioned in accordance with this section." Sanctions include censure, suspension or expulsion from the group. Assuming—as seems to be the case—that the pamphlet here violated these by-laws, Farid was subject to these specific sanctions. But he was instead disciplined under *prison* regulations. There is nothing at all in the by-laws that gives notice that discipline under prison regulations, which permit far more severe sanctions—such as the three months in the SHU which Farid had to serve—than expulsion from a prisoner organization, can be a consequence of doing nothing more than infringing the LTC's by-laws. Farid's knowledge of the LTC by-laws, therefore, did not suffice to give him notice, actual or constructive, that his breach of the by-laws could be deemed to violate prison regulations. Accordingly, unless he had other reasons to know that what he did was against *prison* rules, these regulations were improperly applied to him.

Of course, a breach of a group's by-laws can also, independently, violate prison rules. And Defendants argue that this is the case here. They point out that the contraband rule is broad,

13

and contend that this breadth saves it from Farid's challenge. As we have seen, the rule identifies as contraband that which is not "specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility." Defendants assert that far from demonstrating vagueness, the breadth of this prohibition sufficed to let Farid know that *anything* lacking the prior approval of the superintendent was contraband under prison regulations.

But this explanation is neither convincing nor consistent with Defendants' other statements, such as Defendant Miller's testimony that Farid would not have been in violation of the prison rules if he had simply produced and possessed the pamphlet himself without including the LTC's imprimatur on it. *Farid III*, 514 F. Supp. 2d at 490 ("Defendant Miller[,] who presided at the hearing, asserted that had defendant complied with the by-laws of LTC, 'The Politics of Parole' would not have been contraband."). "As applied"—that is, on the facts before us—it was solely the alleged violation of the LTC's by-laws (i.e., the failure to have the document approved according to that organization's rules) which led to the pamphlet's classification as contraband. And that is not sufficient to give Farid adequate notice of a potential punishment under the prison's regulations. The law does not require Farid to engage in some kind of interpretive construction, combining the LTC's by-laws with the prison rules in order to determine whether materials that violate the former might at the will of prison officials be read to constitute contraband under the latter. That is precisely the kind of interpretive burden that we rejected in *Chatin*, and we do so again here.

Defendants repeatedly emphasize that Farid had *actual* notice of the LTC rules, particularly since he and other LTC members had been notified—recently and specifically—that

14

LTC correspondence must be authorized. In the spring of 1999, about a year before Farid was disciplined, members of the LTC violated prison rules by organizing a conference at WCF without following proper procedures. Defendant Keane, WCF's Superintendent, sent a letter to members of the LTC informing them that they must follow "the proper procedures for inviting community guests to participate in correctional facility functions." Keane attached to this letter the LTC by-laws and the DOCS Directive regarding inmate organizations.[5] And, that Farid was aware of the regulations is evident, Defendants say, because of the "furtive nature" of his activity in producing the pamphlet—it was written on a computer that he was not authorized to use for private purposes. Defs' Br. 28.

All of this, they argue, differentiates the present case from *Chatin*, because the prisoner in that case was neither warned that his conduct was proscribed nor subjectively believed it to be. *See Chatin*, 186 F.3d at 87-88. And unlike *Chatin*, where discipline was based solely on DOCS rules which were "not distributed to inmates," 186 F.3d at 84, Farid violated the LTC by-laws, which were available to, and signed by, all members of the LTC. So long as Farid actually knew that his conduct was prohibited, Defendants assert his failure-of-notice vagueness claim must fail. *See Duamutef v. O'Keefe*, 98 F.3d 22, 25 (2d Cir. 1996).

This argument did not convince the District Court, and it does not convince us. *See Farid III*, 514 F. Supp. 2d at 491 ("The respondents [fare] no better by trying to link possession and distribution of the booklet to an earlier warning by the Superintendent to the LTC that members

---

[5] Aside from this reprimand, no members of the LTC were disciplined as a result of the incident, but Defendants correctly point out that this does not necessarily matter, so long as the members of the LTC were put on notice that what they had done was wrong.

15

of the outside community may not be invited to the prison without advance notice and permission."). The warning surely served to remind Farid and the other members of the LTC that they had signed by-laws and were bound by them. But that does not cure the problem the District Court identified, which is that, in Farid's case, his behavior was punished not as a violation of the by-laws of the LTC but as a breach of *prison* rules.[6]

Moreover, even if we agreed with Defendants that Farid had adequate notice that failure to have the pamphlet approved in accordance with LTC by-laws might subject him to prison discipline, that conclusion would only satisfy half of the vagueness inquiry we outlined in *Chatin*. In addition to being unconstitutional for failure to provide notice, a statute or regulation may be unconstitutionally vague when it "fails to provide sufficiently explicit standards for those who apply it when it 'impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis.'" *Chatin*, 186 F.3d at 89 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). In other words, in order to survive a vagueness challenge, a rule must both provide adequate notice to those who are governed by it *and* adequately cabin the discretion of those who apply it.

The prison rules against contraband and smuggling, as applied to Plaintiff here, gave almost complete enforcement discretion to prison officials. Although the District Court did not give extensive consideration to this issue, it concluded that "the application of the contraband

---

[6] We note in passing that we do not accept as evident that Farid produced the pamphlet in a particularly furtive or suspicious way. Although it is true that he failed to obtain proper authorization and wrote it on a computer not intended for such projects, Farid noted that while he was drafting the document he showed it to Corrections Officer Floyd, the prison's law librarian, who did not object. This of course is not the same as getting proper approval, but it does suggest that Farid was not attempting to cover up his activity entirely.

and anti-smuggling rules contained no explicit standards and placed unfettered discretion in the hands of the prison staff insofar as the rules were applied to written materials." *Farid III*, 514 F. Supp. 2d at 492. Indeed, the catch-all contraband rule allowed prison officials to determine in their unbounded discretion what was and was not "specifically authorized" in the facility.

Farid was disciplined under prison rules prohibiting "smuggling" and the possession of "contraband." But the only thing that made his pamphlet contraband—which in turn meant that he engaged in "smuggling" by giving it to other inmates—was the fact that the pamphlet was not approved in accordance with the *internal* by-laws of his prisoner organization, the LTC. We agree with the District Court that the application of prison rules in these circumstances was unconstitutionally vague both because it failed to give Farid notice that his actions were prohibited and because it failed adequately to cabin the discretion of prison officials.

**III. Defendants' Claim of Qualified Immunity**

Our finding that the regulations were unconstitutionally vague, however, does not by itself mean that Defendants are liable. The District Court, having found a violation of Farid's First Amendment rights, held that Defendants were entitled to qualified immunity. Their conduct, the court concluded, did not violate any clearly established rights about which a reasonable person would have known. Having carefully considered the record, we cannot agree.

Qualified immunity protects government officials "from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). Such immunity shields government officials from civil liability "insofar as their conduct does not violate clearly

17

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow*, 457 U.S. at 818. A defendant is entitled to summary judgment on the issue of qualified immunity

> if [he] "adduce[s] sufficient facts [such] that no reasonable jury, looking at
> the evidence in the light most favorable to, and drawing all inferences
> most favorable to, the plaintiffs, could conclude that it was objectively
> unreasonable for the defendant[ ]" to believe that he was acting in a
> fashion that did not clearly violate an established federally protected right.

*Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (quoting *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C. Cir. 1986) (Scalia, *J.*, sitting by designation)).

We first consider whether Defendants' actions violated a clearly established statutory or constitutional right. For a right to be clearly established, it "must have been recognized in a particularized rather than a general sense." *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (internal quotation marks and citation omitted). We must therefore define the disputed right "at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

In the present case, Defendants have suggested two potential justifications for Farid's punishment under the prison regulations: either as a direct result of his violation of the LTC by-laws; or as a consequence of the contraband rule, which Farid allegedly breached indirectly *by* violating the LTC by-laws. We have explained why we think that neither of these justifications is constitutionally adequate. For qualified immunity purposes, however, we must more precisely define the rights at issue, and only then determine whether they were "clearly established."

In keeping with Defendants' two possible characterizations of their conduct, we find that there are two characterizations of the relevant right: either as a right not to be punished under Rule A (*e.g.*, the prison's contraband regulation) for violating Rule B (*e.g.*, the LTC by-law); or

18

as a right not to be punished under prison regulations that are too vague to constrain official conduct or to give prisoners notice of what conduct is prohibited, unless read in conjunction with the LTC by-laws—and then only arguably. We find that both of these rights are clearly established, albeit for different reasons, and that a jury might well find that a reasonable officer should have known that they were so established. Moreover, fact questions exist as to Defendants' justification for their conduct and therefore as to which of the rights described above has arguably been infringed. Summary judgment on the question of qualified immunity was therefore inappropriate, and must be vacated.

First, Defendants seem to suggest that Farid's violation of LTC by-laws was *by itself* sufficient to justify discipline under prison regulations. *See Farid III*, 514 F. Supp. 2d at 490 ("Defendant Miller[,] who presided at the hearing, asserted that had [Farid] complied with the by-laws of the LTC, 'The Politics of Parole' would not have been contraband."). We have already explained why this is not constitutionally sufficient. *See supra* at **[14]**. For qualified immunity purposes, however, there is a separate question, which is whether the right violated by this conduct was clearly established. We have no trouble concluding that the right not to be punished under one set of rules for violations of another is clearly established. The very essence of constitutional prohibitions on vagueness is that rules must give notice of the conduct that *they* (not another set of rules) prohibit, and must constrain the discretion of officials who apply *them*. This is impossible where prohibitions and punishments are set out in one set of rules, but officials remain free to impose punishments established in an entirely different set of rules not referenced by the first.

19

There is another way to read Defendants' argument, however—that any vagueness in the application of the prison's contraband regulation is cured by the fact that Farid had notice of the LTC by-laws. This seems to be the main thrust of Defendants' argument on appeal, and it is different from the first argument because it begins with the prison regulations, not the LTC by-laws, and essentially argues that prisoners must read them in conjunction. In this way, it is not so much a direct defense of the prison's contraband regulation as it is an argument that the regulation can be read alongside the internal by-laws of a prisoners' organization to achieve a constitutional result. We have explained above why we do not think that the existence of the LTC by-laws cures the vagueness of the prison's contraband and smuggling regulations as they were applied in this instance. *See supra* at **[15–17]**. But for qualified immunity purposes, we must also consider Defendants' second characterization of the rights they might have violated. Under this second purported justification, the relevant question is whether prisoners' right not to be punished under DOCS rules, without sufficient notice that their conduct is prohibited by those rules, is clearly established—even where that conduct is prohibited by other rules.[7]

We conclude that it is. Although we are aware of no cases involving the vagueness of the precise regulations challenged here, our conclusion is strongly supported by caselaw in this Circuit. Qualified immunity can be denied where a rule is "clearly foreshadow[ed]" by past precedent, *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (internal quotation marks omitted),

---

[7] The District Court determined that "an appropriately tailored formulation would be the right not to be punished for possession or distribution of a written expression of ideas pursuant to prison rules that do not give notice of the basis by which the written expression would be determined to be improper to possess or distribute." *Farid III*, 514 F. Supp. 2d at 493-94. This construction is not wrong. But, we believe, that the District Court did not follow through on the implications of its own correct formulation.

and similar cases, applying similar regulations, have come to similar conclusions. Most notably for present purposes, in *Chatin* we found that a prison regulation banning unauthorized "religious services" was unconstitutionally vague as applied to a prisoner's silent, individual prayer, where the prisoner had no actual or imputed knowledge that he would be subjected to discipline for such prayer. The District Court distinguished *Chatin*—the same case on which it had relied in finding the rules unconstitutionally vague—on the grounds that "different prison rules are at issue and the nature of the conduct included the implied representation in the written materials that an officially approved organization of inmates had been given institutional permission to transmit the materials." *Farid III*, 514 F. Supp. 2d at 494.

But "for a right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." *Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000). And *Chatin* comes mighty close to holding the conduct here at issue to be unlawful. As noted above, in that case we rejected DOCS's argument that a rule's potential vagueness could be cured where it was read in conjunction with an internal DOCS Directive and memorandum specifying the rule's reach. *See Chatin*, 186 F.3d at 87-89, 91. We held that prisoners are not required to synthesize prison regulations with other potentially relevant restrictions on their conduct. Here, too, we reject Defendants' argument that Farid should have read the contraband and smuggling rules alongside the LTC's internal by-laws and interpreted them in conjunction as saying that conduct barred under the latter is punishable under the former. And, as a result of *Chatin*, we also reject the argument that it was not clearly established that prisoners could not be expected to synthesize disparate regulations.

21

Multiple questions of material fact exist regarding these two potential theories of qualified immunity. First and most prominently, questions of material fact exist as to *which* of the two theories is properly the focus of Defendants' claim. That is, it is unclear whether Defendants actually intended to punish Farid under the prison contraband rule, or whether they were instead punishing him simply for violating the LTC by-laws. The thrust of their argument on appeal tends to suggest the former, but as the District Court noted, many of their statements below suggest the latter. *See*, *e.g.*, *Farid III*, 514 F. Supp. 2d at 490. This is a distinction with an important difference, because it is impossible—especially on summary judgment—to evaluate Defendants' claims of qualified immunity without knowing the basis for those claims. These questions of material fact would constitute sufficient reasons in and of themselves to vacate and remand the grant of summary judgment with regard to qualified immunity.

Moreover, and for substantially the same reasons that we find the rights at issue here to be clearly established, we conclude that a jury could have found that reasonable prison officials should have known that these rights were established, and that their conduct here violated them. This is true whichever of the two possible theories of qualified immunity we consider. We have little trouble concluding that the first construction—the right not to be punished directly under Rule A (the prison's contraband rule) for violating Rule B (the LTC's internal by-law)—should have been clear to any reasonable officer. Accordingly, insofar as Defendants argue that they are entitled to qualified immunity because Farid's violation of LTC rules automatically subjected him to punishment under prison regulations, we find that the grant of qualified immunity was inappropriate.

The same conclusion follows if we instead focus on the second issue noted above: whether otherwise-vague prison regulations can be saved so long as the disciplinary authorities also invoke the internal by-laws of a prisoner organization. This seems to be the issue that the District Court found dispositive. That court found that "even if this Court assumed that the right was clearly established, the defendants would be entitled nevertheless to summary judgment on qualified immunity." *Farid III*, 514 F. Supp. 2d at 494. Specifically, it concluded that "a reasonable prison official could have considered the LTC by-law requiring staff approval of correspondence from the LTC to have been sufficient notice of prohibited conduct." *Id.* at 494–95. We disagree. Especially in light of *Chatin*, a jury could very well decide that it is unreasonable for a prison official to act on the belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner to discipline under the prison's rules.

Accordingly, we conclude (a) that Farid's rights are clearly established under either possible construction—either as a right not to be punished under Rule A for violating Rule B, or as a right not to be punished under a prison rule which does not give adequate notice (unless read in conjunction with unrelated prisoner organization by-laws) that the conduct is prohibited, and (b) that a reasonable officer should know that these rights were so established. We emphasize however, that because this case comes to us following a grant of summary judgment for the Defendants, the question at this stage is not whether Defendants might ultimately be entitled to qualified immunity under either of these theories, but only whether Farid has adduced sufficient facts such that a reasonable jury, looking at the evidence in the light most favorable to Farid, could conclude that it was objectively unreasonable for Defendants to believe that they were acting in a fashion that did not clearly violate an established federally protected right. *Robison*,

23

821 F.2d at 921. We find that he has, and therefore vacate the District Court's grant of summary judgment and remand for further proceedings, as to the ultimate merits of which we express no opinion.

**IV. Farid's Retaliation Claim**

Farid contends that his First Amendment claim includes a retaliation claim that was not addressed by the District Court. In his *pro se* complaint, Farid alleged generally that "defendants have violated [his] rights under the First Amendment . . . when they applied disciplinary sanctions upon [him] for engaging in conduct that was constitutionally and statutorily protected." Compl. ¶ 101. In *Farid II*, the District Court appeared initially to treat this language as raising a retaliation claim under the First Amendment. *See* 2006 WL 59517, at *8. As previously recounted, the District Court then denied, without prejudice, summary judgment as to Farid's First Amendment claim and invited further briefing. Subsequently, in *Farid III*, the District Court addressed Farid's First Amendment claim, but the Court did not treat it as a retaliation claim. Instead, the District Court decided the issue exclusively on vagueness grounds. *See* 514 F. Supp.2d at 488–93.

It is unclear from the record whether the District Court—with the benefit of further briefing to supplement Farid's *pro se* complaint—ultimately read that complaint as raising only a First Amendment vagueness claim rather than a separate retaliation claim as well. Both parties, however, seem to argue that the claims are in fact separate. *See* Defs.' Br. at 30 ("As Farid observes, the district court, having converted Farid's First Amendment claim into a void-for-vagueness challenge, did not rule on any retaliation claim that Farid may have pleaded."); *id.* at

24

30-34 (presenting a substantive argument for why the State should be granted summary judgment on Farid's retaliation claim).

Because we are remanding this case with respect to Farid's vagueness claim, we deem it appropriate to remand as to this issue also. On remand, the District Court should determine in the first instance whether Farid adequately pled a separate claim for retaliation under the First Amendment. The Court may then hold such further proceedings as it believes appropriate in the light of its reading of Farid's complaint.

**V. Farid's Confiscation Claims**

Farid has also raised § 1983 claims regarding the confiscation of certain papers and personal effects from his cell. The District Court found that this claim, unlike his vagueness challenge, was not administratively exhausted. We agree.

The Prison Litigation Reform Act requires a prisoner petitioner to exhaust "such administrative remedies as are available" before filing suit in federal court. 42 U.S.C. § 1997e(a). The Supreme Court has made clear that "the PLRA's exhaustion requirement applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Here, Farid concededly has not exhausted his administrative remedies.

Farid argues, however, that his confiscation claim is intertwined with his challenge to the disciplinary hearing, which *was* administratively exhausted. He says that he reasonably believed that the claims were so interrelated that he could not be expected to distinguish them. *See Giano v. Goord*, 380 F.3d 670, 679 (2d Cir. 2004). This argument is unavailing. We agree with, and affirm, the District Court's finding that "Farid's concern here is *not* confiscation as a constituent element of the disciplinary hearing," but rather "confiscation as part of a scrutiny that arose in

25

light of his political and organizational activities." *Farid I*, 2003 WL 23018805, at *3 (emphasis added). That is because "[t]he act of confiscation was not a constituent aspect to the disciplinary hearing," and instead "involved discrete events outside the purview of a disciplinary hearing, [events] that should have been grieved through the IGP." *Id.* Since it was not, Farid's confiscation claim cannot be heard by us.

**VI. Farid's Medical Claims**

Farid has also alleged that Defendants violated his Eighth Amendment rights through their alleged deliberate indifference to his medical condition—primarily his Hepatitis C, for which he received only sporadic treatment. An inmate attempting to show deliberate indifference must demonstrate that the defendants "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm w[ould] result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

Having carefully and independently reviewed the record, we agree with the District Court that Farid has not shown that Defendants acted with "conscious disregard of a substantial risk of serious harm." *Farid II*, 2006 WL 59517, at *11. At best, Farid has produced evidence tending to show that Defendants may have been negligent. But negligence is insufficient to support an Eighth Amendment claim.

The parties also dispute whether Defendants were personally involved in Farid's medical treatment or lack thereof. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Because we affirm the District Court's determination that Farid has

26

not shown deliberate indifference, we need not reach the separate question of whether Defendants were personally involved in his treatment. For similar reasons, we do not consider whether Farid's medical condition would be grave enough to support an 8th Amendment claim if his treatment had been shown to be deliberately indifferent.

For the reasons above, we AFFIRM the District Court in every particular except one. We agree with the District Court that Farid's rights were violated by the application of unconstitutionally vague prison regulations, but we do not agree that Defendants are entitled to qualified immunity for that violation. We therefore VACATE that portion of the District Court's decision in *Farid III*, and REMAND for further proceedings consistent with this opinion.